George E. SHULTZ, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

SAXONBURG CERAMICS, INC., a corporation, Defendant.

Civ. A. No. 67–1079.

United States District Court, W. D. Pennsylvania.

July 15, 1970.

Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., Louis Weiner, Regional Atty., William Fauver, Donald Elisburg, U. S. Dept. of Labor, Washington D. C., for plaintiff.

Owen B. McManus, Pittsburgh, Pa., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

GERALD J. WEBER, District Judge.

This is a suit by the Secretary of Labor under Section 17 of the Fair Labor Standards Act [29 U.S.C. § 201 et seq.] to enjoin the defendant company from violating the equal pay provisions of that statute and to order the payment of back wages resulting from defendant's violation of the equal pay provisions since the effective date of the Act, June 11, 1964.

Defendant is a Pennsylvania corporation organized in November 1964 as a successor to a prior corporation of the same name whose assets were acquired and whose liabilities were assumed. Job descriptions and hourly pay rates as developed through prior experience of the predecessor corporation and its union contracts were continued but with the coming of new ownership and a new management, reorganization of various job procedures and job assignments were studied and changes were instituted.

It is admitted by Stipulation in this case that the defendant is a corporation

engaged in commerce or the production of goods for commerce within the meaning of the statute and that its employees have been covered by the equal pay provisions of the statute since June 11, 1964.

Defendant operates a plant in Saxonburg, Pennsylvania, which produces ceramic products. This action concerns itself only with the Extrusion Department of the plant where defendant regularly operated four vertical extrusion presses and one horizontal extrusion press, generally running these presses three shifts a day. These presses were operated variously by one or two operators for each shift. Other employees in the Extrusion Department were assigned other non-operating duties. Prior to a reorganization of job classification on December 14, 1965, the classification of employees in the Extrusion Department was among Extrusion Press Operators; Extrusion Press Operator and Die Setter; Pug Mill Operator; Pug Mill Feeder and Tube Breakers.

Specifically, this action is concerned with the female employees of the Extrusion Department who have performed the job entitled "Extrusion Press Operator" and male employees who performed the job which defendant entitled "Extrusion Press Operator—Die Setter" prior to the December 14, 1965 reorganization. About 10–12 women and 3–4 men were involved.

Prior to December 14, 1965 females were assigned to the job "Extrusion Press Operator" and males were assigned to the job of "Extrusion Press Operator and Die Setter". The male job assignment received 30¢ per hour more than the female job assignment. It is the contention of the plaintiff here that the work done by the male "Extrusion Press Operator and Die Setter" and the work done by the female "Extrusion Press Operator" were equal and required equal pay. On December 14, 1965, those males formerly classified as "Extrusion Press Operator and Die Setter" were removed from all duties connected with the operation of the extrusion presses and

were given a new job description as "Set-Up and Service". Thereafter, all the women employees continued to act as operators of the extrusion presses and their assignment was enlarged to include all presses, two of which were formerly operated by male employees only. The former male press operators were removed from all press operation duties and given the new set-up and service assignment. The basic 30¢ per hour differential in wages between the female operators and the former male operators was continued, but there is no contention by plaintiff that the work performed by the two new classifications after December 14, 1965 was equal. Defendant argues that the revision of the tasks between men and women and the installation of a plant-wide incentive system terminated defendant's duty to pay the women press operators the former higher male rate which men were paid when both men and women operated the presses.

The plaintiff alleges that the changes which defendant relies on have no bearing on the continued right of women press operators to have their pay raised to the former higher male rate which the males were paid as Extrusion Press Operators—Die Setters for work which was equal to the work performed by the female extrusion press operators. After the change of December 14, 1965 when all former male operators were removed to the new job classification, new male employees were hired as "Extrusion Press Operators" at the same pay rate as the female Extrusion Press Operators received.

From all of the testimony in the case it appears that for many years men and women extrusion press operators worked interchangeably, at least on presses 1, 2 and 4. The operation of the horizontal extrusion press (pug mill) and press No. 3 which was a press for larger products operated by a single operator seemed to have been assigned exclusively to male operators. In December 1959 the Commonwealth of Pennsylvania enacted an "Equal Pay Act" prohibiting pay dif-

ferential for the same work on the basis of sex. At this time three duties were removed from the female extrusion press operators; the installing or removing of the G. C. holder (29 pounds) or the small holder adapter (18½ pounds); knocking the clay plug into the cylinder when changing clay; and steering and pulling the rack wagon. These were operations which the female operators had previously performed and which they demonstrated their ability to perform during the trial of this case in the courtroom. This distinction in the tasks performed by the male operators and the female operators was one based upon weight lifting ability and physical effort required, although the female operators had performed these tasks before. Prior to the defendant's first labor contract, in 1961, the jobs were classified by sex as "Extrusion Press Operator—Male" and "Extrusion Press Operator—Female." In the 1961 labor contract the jobs were identified as "Extrusion Press Operator—Female" and "Extrusion Press Operator and Die Setter—Male". The additional description "and Die Setter" was added to the male job title beginning with the 1961 labor contract. Apparently this was in recognition of the three duties which were assigned exclusively to male press operators after 1959. The defendant continued to classify the female operators as "Extrusion Press Operator" and the men operators as "Extrusion Press Operator and Die Setter" until its September 1965 labor contract and from and after 1963 the hour rate between the male and the female operators provided 30¢ more per hour for the male operators. The effective date of the application of the statute in question to this case is June 11, 1964 and from that date until December 1965 no male was employed as an "Extrusion Press Operator" and no female was employed as an "Extrusion Press Operator and Die Setter". Up to September 1965 under the prevailing union contract the sexual designation of these jobs was preserved and there was no way that males could have been classified in

the "Extrusion Press Operator" job or females classified in the "Extrusion Press Operator and Die Setter" job. It is through this history that the basic pattern of differences in the pay rates for males and females in this plant was established and in the opinion of the court was continued despite changes in job classifications which attempted to differentiate between the work assigned to the two sexes.

From and after December 14, 1965 there is no dispute that the jobs performed by the "Extrusion Press Operators" and the new description "Press Set-Up and Service", to which all males were removed, were different and unequal. However, the pattern of a 30¢ per hour pay differential under which the female operators had worked was not changed and the plaintiff argues that this job reclassification in effect resulted in a 30¢ per hour wage rate reduction for female workers because they had been entitled to the same pay rate as male operators from and after the effective date of the statute, June 11, 1964.

The essential distinction that defendant has attempted to draw between the work performed by male operators and by female operators ever since the adoption of the Pennsylvania Pay Law was based upon weight lifting and physical force. The most striking single illustration of this was the handling of the G. C. holder which weighs 29 pounds, and which has the size and shape of a bowling ball. At the trial one of the female operators demonstrated the facility with which she handled this appliance and it was shown that before the distinction in job classification was drawn the female operators had regularly handled this appliance. It was also testified that women had regularly performed all of the tasks prior to 1959 which were removed from their job classification that year and had performed them during the night shift when there was no male operator present to give any assistance. While the women were forbidden to take down or put up the G. C. holder into the machine the women operators

stripped down the die assembly and installed or removed it from the G. C. holder and regularly carried the G. C. holder and the die holder and adapter to and from her work bench. As for the prohibition against women knocking the clay plug into the cylinder women regularly took the clay plug out of the cylinder as the male operator knocked it into the cylinder, and as for the prohibition against women pulling or steering the rack wagon women continued to aid by pushing the rack wagon as the male pulled it.

## FINDINGS OF FACT

1. Prior to 1961 the job classification in Defendant's Extrusion Department were:

(1) Extrusion Press Operator—Male;

(2) Extrusion Press Operator—Female.

2. After the 1961 labor contract the title of the male job classification was changed to:

(1) Extrusion Press Operator and Die Setter—Male.

3. Prior to December 1965 on presses numbers 1, 2 and 4, operators worked in pairs without regard to the above job classification. All operators interchangeably performed all duties in connection with the operation of these presses. The production of these presses were laid on boards which weighed up to thirty pounds loaded.

4. Prior to December 1965 only male-Extrusion Press Operators and Die Setters were permitted to use Press No. 3, which could only be operated by one operator. This press was able to produce larger items. The production of this press was laid on boards which weighed about forty pounds loaded.

5. There was no substantial difference in the skills required to operate Presses numbers 1, 2 and 4 as compared to Press No. 3.

6. The rate of production on Press No. 3 was about one-half the rate of the other presses and its operator handled the same number of boards as each of the two operators on the other presses.

7. About 75% of the production on Press No. 3 required the use of the General Ceramics holder which was heavier than other die holders weighing about 29 pounds. The other presses used the General Ceramics holder at various times during the production runs.

8. At the time of the adoption of the Pennsylvania Equal Pay Act in December 1959 three duties formerly performed by the Extrusion Press Operators—Female, were removed from them:

(1) Taking down or putting up the General Ceramics holder (29 pounds) or the holder-adapter (18½ pounds) on any press;

(2) Knocking the clay plug into the cylinder when changing clay;

(3) Pulling or steering the rack wagon.

9. The duties taken away from the Extrusion Press Operators—Female, after December 1959 involved no greater skill or training than the other duties assigned them and had been regularly performed by them before.

10. Defendant produced no evidence that any female operator was ever unable to perform any of the duties assigned exclusively to the male operators.

11. The Act in question became effective as to defendant on June 11, 1964.

12. From and after June 11, 1964 the Male—Extrusion Press Operators and Die Setters were paid 30¢ per hour more than the Female—Extrusion Press Operators, a rate established for these two job classifications under defendant's 1963 union contract, and this 30¢ per hour differential was continued under the 1965 union contract with specific future increases for each classification of the same 30¢ per hour differential.

13. From June 11, 1964 to December 1965 the defendant company made up weekly work assignments which assigned both the male and the female operators interchangeably to Presses Nos. 1, 2 and 4 performing all duties in connection

therewith, except for the three restrictions adopted in 1959.

14. The jobs done by the male and female operators on Presses Nos. 1, 2 and 4, and the sole male operator on Press No. 3 were substantially equal in training, physical effort, skill and responsibility.

15. No male Extrusion Press Operator ever planned, supervised or directed the work of any female Extrusion Press Operator.

16. The duties performed by male Extrusion Press Operators and Die Setters which were excluded from female Extrusion Press Operators were occasional and intermittent, and not in the regular course of press operation, and did not involve the highest skills required for performance of either job.

17. Both male and female operators during the course of their duties frequently lifted average weights and exerted physical effort to the same degree in the performance of all the duties of their assignments.

18. As of December 14, 1965 the Defendant changed the job classifications of all male Extrusion Press Operators and removed them from operating the presses. A new job classification was established as:

"Press Set Up and Service"

the pay scale for which was the same as the former classification.

"Extrusion Press Operator and Die Setter—Male"

at a differential of 30¢ more per hour than the female operators.

19. After December 14, 1965 the jobs performed by "Extrusion Press Operators" and "Set-Up and Service" were not equal.

20. An incentive pay system was adopted for Extrusion Press Operators, the basis for which was the hourly rate previously established.

21. Extrusion Press Operators under the classification established in December 1965 also undertook the following duties formerly performed only by Extrusion Press Operators and Die Setters —Male, at the 30¢ per hour higher rate; operation of Press No. 3; operation of the pug-mill press.

22. Extrusion Press Operators under the job classification adopted in December 1965 operated all presses alone and performed all functions in connection with them which formerly they performed with their team mates (whether male or female) thus resulting in greatly increased physical effort on their part.

23. There was removed from Extrusion Press Operators in December 1965 the following duties:

(1) Moving all materials to and from the presses;

(2) Changing dies;

(3) Making repairs and adjustments.

24. The change of job classification in December 1965 did not change the level of training, skill, responsibility or physical effort formerly required of Extrusion Press Operators—Female, before December 1965.

25. The "Extrusion Press Operators" after December 1965 exercised the same degree of effort, responsibility and skill as was required of the classification, Extrusion Press Operators—Female, prior to December 1965.

26. From June 11, 1964 to December 14, 1965, defendant paid Female Extrusion Press Operators a differential of 30¢ per hour less than it paid Male Extrusion Press Operators and Die Setters for equal work on jobs, the performance of which required equal skill, effort, training and responsibility, and performance under similar working conditions.

27. Since December 14, 1965, defendant has continued to pay women extrusion press operators on an hourly basis, 30¢ per hour less than the hourly rates established for men prior to the December 14, 1965 reclassification for the work which was formerly done by the men operators which we have found to be no different in skill, training, effort and responsibility.

28. The job classification of December 14, 1965 which eliminated men from the position of extrusion press operators did not effect the degree of skill, effort and responsibility formerly exercised by women operators in the job classification prior to that date.

29. The job classification of December 14, 1965 continued the unequal differential between the rates established for Male Extrusion Press Operators and Female Extrusion Press Operators that existed prior to December 14, 1965.

30. The incentive pay system put into effect on December 14, 1965 continued the existing basic rate structure established on an hourly basis. It applied plant wide and benefited male as well as female employees. It was based on the existing hourly rate structure.

31. The wage differential between the rate paid Extrusion Press Operators and Extrusion Press Operators—Die Setters prior to December 14, 1965 was based on sex.

32. Wage rates paid Extrusion Press Operators since December 14, 1965 have continued a basic differential in pay rates established prior to December 14, 1965 based on sex.

33. Prior to the change of job classification on December 14, 1965, when extrusion press operating functions were completely severed from the press set-up and service functions, the alleged flexibility argued by defendant in support of its classifications of male and female press operators yielded no discernible economic benefits to defendant. On the contrary, the evidence shows that the economic benefits to defendant only arose after December 14, 1965 when the flexibility characteristics of the existing job classifications were eliminated by the total separation of press operation functions and press service functions. Thus, the evidence shows that the defendant company achieved economic benefits when it eliminated the flexibility characteristic.

## DISCUSSION

Plaintiff has the burden of proving that the jobs performed by men and women are substantially equal. Plaintiff has met this burden. Saxonburg's principal defenses are a bona fide occupational qualification, in the form of a weight lifting and physical activity restriction, as an exception to the coverage of the Act, and an element of flexibility inherent in the job classifications which is of economic value to the company because of the unique or "custom-made" character of its operations.

The distinction which defendant attempts to draw between the work of the male press operators and the female press operators is based on the occasional and intermittent necessity of exercising additional physical effort or force; the occasional changing of the 29 pound General Ceramics die holder; the occasional loading of the machine with a new clay plug; and the pulling of loaded wagons of trays of materials from the press. Women were forbidden to pull and steer the wagon because of the possibility of its tipping, but no evidence was shown that a wagon ever tipped when pulled by a woman. However, women were allowed to push the loaded wagon. Similarly, women could not push the clay plug into the machine but they could remove it from the machine. Women were not allowed to place the 29 pound die holder in the press, or to take it out, because this was done from an awkward position, but they could carry the 29 pound holder from their press to the die table.

Further, the defendant's argument that male press operators had to be assigned additional duties and had to be assigned to all the shifts in order to be present to meet special requirements that might arise on any shift, in other words, to achieve the necessary flexibility, was refuted by the evidence that the women operators could and did perform all of the functions of the male job classification.

Throughout the entire trial of this case one element was outstanding. The women employees were shown to have been fully competent and capable of performance of all the functioning of the press operations, and did perform them prior to the restrictions of male-related functions first imposed in 1959 at the time of the enactment of the Pennsylvania Equal Pay Act, 43 P.S. § 336.1 et seq.

■ Weight lifting restrictions imposed on female employees are no impediment to a finding that jobs performed by male and female employees are equal when only a small percentage of the total work time is taken up by the extra (i. e. weight-lifting and other physical activity) duties assigned to the male operators. Shultz v. Wheaton Glass Co., 421 F.2d 259 [3rd Cir., 1970] [18%]; Shultz v. American Can Co., 424 F.2d 356 [8th Cir., 1970] [7%]. This is so even if some or all of the women operators are unable to perform these additional duties. Wirtz v. Rainbo Baking Co., 303 F. Supp. 1049 [E.D.Ky.1967]; Wirtz v. Koller Craft Plastic Products, Inc., 296 F.Supp. 1195 [E.D.Mo.1968].

■ Secondly, weight-lifting restrictions imposed on women are closely scrutinized by the courts and blanket restrictions which do not take into consideration qualifications of individual employees, such as physiological makeup and physical capabilities, and the conditions of the job in question, will not pass muster as a bona fide occupational qualification. Bowe v. Colgate-Palmolive Co., 416 F.2d 711 [7th Cir., 1969]. In order to rely on a weight lifting restriction as a bona fide occupational qualification exception to the coverage of the Act, the employer must show that he had reasonable cause to believe, which is a factual basis for belief, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved. Weeks v. Southern Bell Telephone & Telegraph Co., 408 F.2d 228 [5th Cir., 1969].

The evidence does not enable us to accurately determine what percentage of the total work time was relegated to the male-only activities as there is considerable variation. There is no doubt, however, that the male-only activities are neither the principal activities nor the most skillful activities of the male-extrusion operators. Most importantly, the evidence does show that *all* of the women were able to perform *all* of these additional tasks. And, defendant did not bring forth any evidence to show that these activities could not be performed safely and efficiently by women. In these two respects defendant has failed to meet his burden of proof. Weeks v. Southern Bell, supra.

■■ In order to permit the wage differential to stand because of a required flexibility of operations the Court must make a finding of the economic value of the element of flexibility in the employer's operations. Shultz v. Wheaton Glass Co., supra. Here, the evidence does not permit us to make such a finding and the defendant has consequently failed to carry its burden of proof.

■ Plaintiff contends that inasmuch as the two jobs were equal within the terms of the Act and that men operators no longer operate these machines, that the continued payment of the "old", lower rate to the female operators who are now exclusively operating the machines is an impermissible wage differential since it amounts to a wage reduction. We agree. This violation will continue until the company, by new contractual arrangement by voluntary action or by court order, raises, or is forced to raise, the wages of the female operators to that of the male operators as of the time the males ceased to operate the machines together with all increments to date. Wirtz v. Koller Craft Plastics Products, Inc., supra, 29 CFR § 800.114 (c). See also Murphy v. Miller Brewing Co., 307 F.Supp. 829 [E.D.Wis.1969].

CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter of this

cause of action pursuant to the Fair Labor Standards Act of 1938, as amended [29 U.S.C. § 201 et seq.].

2. The equal pay provisions of the Act became effective as to defendant and its employees on June 11, 1964.

3. The plaintiff has carried the burden of proof that female employees received lesser wages than male employees for performing equal work under equal conditions on jobs requiring equal skill, effort and responsibility.

4. Defendant has failed to carry the burden of proof required of it that any wage differentials between male employees and female employees were based on any factor other than sex.

5. When male employees classified as "Extrusion Press Operator and Die Setter" were assigned on regular rotating shifts to work with female employees classified as "Extrusion Press Operator" on the same machines, doing substantially equal work, the female press operators were entitled, under the Act, to receive the same rate for operating these presses as the male employees were receiving.

6. During the period from June 11, 1964 to December 14, 1965, defendant violated the equal pay provisions of the Act by discriminating between employees on the basis of sex by paying female Extrusion Press Operators contract rates 30¢ an hour less than it paid male Extrusion Operators and Die Setters for equal work on jobs, the performance of which required equal skill, effort and responsibility and which was performed under similar working conditions.

7. The equal pay provisions of the Act apply where women are employed to do substantially the same work formerly performed by men, as well as where men and women perform equal work currently and interchangeably.

8. The Act required the defendant to raise the hourly rate of female Extrusion Press Operators to equal the hourly rates which men formerly received or were awarded, including any contracted future increases, when the males performed the job of Extrusion Operator and Die Setter. Female Extrusion Press Operators were entitled to be paid the same basic hourly wage rate as was paid to the classification of male Extrusion Operator and Die Setter, including the applicable incentive rates computed on this base hourly rate.

9. Defendant has continued to violate the Act since December 14, 1965 by failing to pay female Extrusion Press Operators for their employment since December 14, 1965 the same hourly rates which male employees were entitled to receive for the job of Extrusion Operator and Die Setter.

10. The revision of job titles after December 14, 1965 did not terminate defendant's duty to pay female Extrusion Press Operators the same contract rates which men formerly received when they performed the job classified as Extrusion Operators and Die Setters because the female operators continued to perform substantially the same level of skill, effort and responsibility, and the same principal activities.

11. Defendant's incentive pay system has no relevance in determining an equal pay violation regarding hourly based employees, because the system was plant wide and was applied as a percentage of existing hourly wage rates.

12. Plaintiff is entitled to an injunction restraining defendant against further violations of the equal pay provisions of the Act and restraining the withholding of back wages resulting from violation of these provisions respecting female Extrusion Press Operators.

## ORDER

And now this 15th day of July, 1970, Judgment shall be entered for Plaintiff in accordance with the foregoing Findings of Fact and Conclusions of Law.

Plaintiff shall submit an Order for Judgment and Permanent Injunction in accordance with this Opinion. The proposed Order shall be submitted to opposing counsel for approval as to form only.

**1148**

Counsel for the parties shall consult and prepare a Stipulation as to the amount of back wages due each affected employee based on each employee's earning records for the period since June 11, 1964, with interest computed at the rate of six percent from the median point of each employee's employment.